PEARSON, J.

FILED

2011 SEP 30 PM 5: 06

UNITED STATES DISTRICT COURT U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO NORTHERN DISTRICT OF OHIO
EASTERN DIVISION YOUNGSTOWN

| | | |
|---|---|---|
| STA-RITE INDUSTRIES, LLC. *et al.*, | ) | CASE NO. 1:09CV01790 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| FRANKLIN ELECTRIC CO., INC., | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** [Resolving ECF Nos. 45 and 46] |

Plaintiffs Sta-Rite Industries, LLC and Pentair Pump Group, Inc. (collectively "Plaintiffs"

or "Sta-Rite") filed the present action against Defendant Franklin Electric Co., Inc. ("Defendant"

or "Franklin") claiming breach of contract and tortious interference with distributors. ECF No. 1

at 7. Defendant filed a Counterclaim alleging breach of contract. ECF No. 4 at 11.

Before the Court are cross-motions for summary judgment. Pursuant to Fed. R. Civ. P.

56(c), Plaintiffs seek summary dismissal of Franklin's Counterclaim;[1] and Franklin seeks

summary dismissal of both counts of the Complaint. ECF Nos. 45 and 46.

After considering the pleadings and oral argument, for the reasons that follow, the Court

grants both motions for summary judgment.

## I. Background

Plaintiffs and Franklin are competitors in the manufacture and sale of submersible pumps

---

[1] Although styled "Counterclaims," Franklin alleges a single counterclaim–Breach of
Contract–with three subparts. ECF No. 4.

(1:09CV01790)

and motors for use in fueling systems and underground wells.[2] ECF Nos. 1 at 4, ¶ 12 and 4 at 7.

Franklin supplied Plaintiffs with submersible electric motors for their pumps, and Plaintiffs

coupled certain Franklin motors with Plaintiffs' pumps, offering such assembled units for sale to

distributors and retailers, who then resold the units to customers. ECF No. 4 at 8, ¶ 7. In 2001,

F.E. Myers, a division of Plaintiff Pentair Pump Group, Inc. ("Pentair"), and Franklin entered

into a written sales agreement that governed Franklin's sale of small-sized motors to Pentair–*i.e.*,

four-inch submersible electric motors, rated one-third horsepower to two horsepower units. ECF

No. 47 at 3. In 2004, Plaintiffs filed a cause of action against Franklin, alleging "breach of [the

2001 Sales Agreement] and anti-competitive behavior . . . ."[3] ECF No. 1 at 3, ¶ 9. The parties

amended the 2001 Sales Agreement by entering into the "Settlement and Mutual Release

Agreement" (the "Settlement Agreement"), effective October 30, 2004 until December 31, 2006.

ECF No. 1 at 4, ¶ 13.

On July 31, 2009, Plaintiffs filed the instant lawsuit alleging, in Count I, that Franklin

breached Paragraph 4(N) of the Settlement Agreement by failing to sell large submersible

motors–four-inch, six-inch, and eight-inch motors–to Plaintiffs at "more favorable prices" in

violation of the "most favored nations pricing provision." ECF No. 1 at 6, ¶ 18 and 21 at 2.

Plaintiffs separately alleged, in Count II, that Franklin tortiously interfered with Preferred Pump

---

[2] "Submersible pumps are products that independent contractors install, or 'submerse,' in underground water wells for the purpose of pumping water to agricultural, industrial, or residential settings. Submersible pumps are powered by submersible motors, which are mounted to the pumps before installation underground." ECF No. 46-1 at 9.

[3] *Pentair Pump Group, Inc., v. Franklin Electric*, U.S. District Court for the Northern District of Ohio, Case No. 1:04CV01975.

(1:09CV01790)

and Equipment, LP distribution agreements. ECF No. 1 at 23-24. Franklin's Counterclaim

asserts that Plaintiffs breached Paragraph 4(P) of the Settlement Agreement by failing to provide

warranty service on Franklin's products for customers; defacing nameplates on motors displayed

at Lowe's Home Improvement retail stores; and disparaging products by promoting other

manufacturers' motors.[4] ECF No. 4 at 7, ¶¶ 15-18.

## II. Discussion and Law

Federal Rule of Civil Procedure 56(c) governs summary judgment motions, and provides

in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a mater of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary

judgment:

> Supporting and opposing affidavits shall be made on personal knowledge,
> shall set forth such facts as would be admissible in evidence, and shall
> show affirmatively that the affiant is competent to testify to the matters
> stated therein. [...] The court may permit affidavits to be supplemented or
> opposed by depositions, answers to interrogatories, or further affidavits.
> When a motion for summary judgment is made and supported as provided
> in this rule, an adverse party may not rest upon the mere allegations or
> denial of the adverse party's pleading, but the adverse party's response, by
> affidavits or as otherwise provided in this rule, must set forth specific facts
> showing that there is a genuine issue for trial. If the adverse party does not
> so respond, summary judgment, if appropriate, shall be entered against the
> adverse party.

---

[4] It is worth noting that the claims in the Complaint and Counterclaim are described
generally and incorporate the more informative "Background" sections. The summaries of the
allegations herein are derived therefrom.

(1:09CV01790)

The movant, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex*, 477 U.S. at 317.

Upon review, the Court must view the evidence in light most favorable to the non-moving party to determine whether a genuine issue of material facts exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *see also White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Cross-motions for summary judgment are examined under the usual Rule 56 standards. *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir. 2005). Each cross-motion must be evaluated on its own merits, with the court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Appoloni v. U.S.*, 450 F.3d 185, 189 (6th Cir. 2006).

-4-

(1:09CV01790)

Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

### A. Count I

Count One of the Complaint alleges that Franklin Electric breached Paragraph 4(N) of the Settlement and Mutual Release Agreement. ECF No. 1. Paragraph 4(N) of the Settlement and Mutual Release Agreement specifies:

> Except with respect to the Maximum Aggregate Payment described in subparagraph 4(G), the EVD described in subparagraph 4(H) and as otherwise stated expressly in this Agreement, nothing herein shall prevent Franklin from making future adjustments to the price (whether by surcharges, discounts, rebates, allowances, or otherwise) of any of its products (including Units) as necessary or appropriate to respond to material, labor, and other business costs as may arise from time to time and upon sixty (60) days advance notice to Pentair. Until December 31, 2006, Franklin agrees not to **raise the price** it charges to Pentair on High HP 4" Motors, 6-inch motors, and 8-inch motors, as well as on control boxes, drives, and accessories, by more than the **price increase** on any such products it charges to other customers, including Franklin Pump Systems, Inc. and any other current or future affiliate of Franklin's through December 31, 2006.

ECF No. 47 at 24 (emphasis added).

"Under Section 4(N) of the Settlement Agreement, Plaintiffs [believe they] were assured that they would continue to maintain their price advantage over other distributors because

-5-

(1:09CV01790)

Franklin Electric could not raise the prices to Plaintiffs on the Non-Units by more than Franklin Electric could raise the prices to other customers." ECF No. 1 at 5. Franklin argues that the ordinary and plain language of Paragraph 4(N) does not assure Plaintiffs the "lowest price" or "most favored nation" pricing on Non-Unit products. ECF No. 46-1 at 20.

### 1. Relevant Undisputed Facts (Related to Count I of the Complaint)

Plaintiffs' Count I Breach of Contract claim "pertains *solely* to Non-Units." ECF No. 46-1 at 13 (emphasis in original). The Settlement Agreement defines "Units" as "four-inch submersible electric motors, rated 1/3 HP through 2 HP," and provided that through December 31, 2006, "Franklin shall not sell any Units within the United States of America ('USA') and Canada to any customers except original equipment manufacturers ('OEMs') and 'Class A' Franklin Authorized Service Shops ('FAMS')."[5] ECF No. 47 at 19, ¶¶ 2, 4(A).

Paragraph 4(C) of the Settlement Agreement provides that Franklin Electric is free to "sell [Non-Units] to any customers of its choosing, without limitation, including distributors, notwithstanding Franklin's prior sales policies and practices, and whether or not Franklin sold to

---

[5] The Settlement Agreement specifies:

The term 'OEM' means an original equipment manufacturer that (a) owns the design, patterns and tooling for the manufacturing of submersible pumps, (b) actively manufactures submersible pumps to which Franklin motors may be attached, and (c) maintains an in-house engineering staff and effort for the development and manufacture of submersible pumps.

The term 'FAMs' means Franklin authorized motor service shops that are independent motor repair facilities appointed and contracted by Franklin provide warranty, repair and replacement services of Franklin products.

ECF No. 47 at 19, ¶ 4(A).

(1:09CV01790)

said customers or distributors previously." ECF No. 47 at 20, ¶ 4(C). Franklin began selling

Non-Units directly to distributors on October 4, 2004. ECF Nos. 46-1 at 13 and 46-2 at 4-5, ¶¶

13-17. The record reflects that Franklin has offered and provided various discounts on Non-Unit

sales to distributors that were not made available to Pump OEMs.[6] ECF Nos. 46-1 at 13 and 46-

2 at 11. Senior Vice President and President of Americas Water Systems Group of Franklin,

Robert J. Stone, explained the following in his declaration:

> [F]or nearly a month prior to, and as of, the date of the Settlement Agreement,
> Franklin had been offering the providing various discounts and rebates on its Non-
> Unit products to distributors, but not Pump OEMs or Plaintiffs. As a
> consequence, prior to October 30, 2004, distributors' next costs for purchases of
> Non-Units, after factoring in discounts, rebates, and credits, were lower than
> Plaintiffs' and other Pump OEMs' net costs for those Non-Units.

ECF No. 46-2 at 5, ¶ 19. Franklin increased its prices on Non-Unit products for all customers on

one occasion in 2005 and on two occasions in 2006. ECF Nos. 46-1 at 14 and 46-2 at 6, ¶¶ 23-

24.

Plaintiffs' breach of contract claim is premised upon Franklin's alleged failure to offer

Plaintiffs discounted prices on Non-Units, which were offered to distributors. ECF Nos. 46-1 at

15 and 50-1 at 55. It is undisputed that customers provided Plaintiffs with documentation of

Franklin's Distributor Incentives on Non-Units in early 2005. ECF Nos. 46-1 at 15 and 49 at 33,

47-50. It is also undisputed that Plaintiffs accepted and paid for all Non-Units delivered by

Franklin without reservation. ECF No. 46-1 at 18.

---

[6] "Plaintiffs, like Franklin, are original equipment manufacturers of submersible pumps."
ECF No. 46-2 at 2, ¶ 5.

(1:09CV01790)

## 2. Count I Fails on Two Independent Bases

### a.

Plaintiffs' failed to provide Franklin with the notice required prior to filing its complaint. Section 26-1-2-607(3)(a) of the Indiana Code and the § 1302.65(c)(1) of the Ohio Revised Code provides: "Where a tender has been accepted, . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."[7] Ind. Code § 26-1-2-607(3)(a); Ohio Rev. Code § 1302.65(c)(1).[8] The definitions of buyer and seller are primarily important when the Uniform Commercial Code imposes special duties on a buyer or seller–*i.e.*, § 2-607(3)(a), as stated above. The Uniform Commercial Code § 2-103(1)(a) defines "buyer" in terms that ignore title and delivery. 2 Anderson U.C.C. § 2-103:6 (3d. ed) (discussing that a "corporation purchasing pipe for an underwater pipe line was a 'buyer'"). According to the Indiana Code, Kevin Hancock and William Waltz are both "buyers," people who buy or contract to buy goods. Ind. Code § 26-1-2-103(1)(a). As Vice President of Sales and Marketing for the Professional Wholesale Division, Kevin Hancock focuses on a "variety of inputs" such as price, service, product, and competition when contracting to buy submersible motors. ECF No. 49 at 26-27. In 2004, William Waltz acted as Plaintiffs' "key"

---

[7] Indiana Code section 26-1-2-103(1)(a) defines "buyer" as "a person who buys or contracts to buy goods" and section 26-1-2-103(1)(d) defines "seller" as "a person who sells or contracts to sell goods."

[8] The Uniform Commercial Code applies because Non-Units as well as Units are "goods." *LDT Keller Farms, LLC*, 2011 U.S. Dist. LEXIS 34209, at *20; *see also* Ind. Code § 26-1-2-105(1) (defining "goods" as "all things . . . which are movable at the time of identification to the contract for sale . . . ").

(1:09CV01790)

contract negotiator, and as President continues to take a lead role in buying and contracting to buy motors. ECF Nos. 48 at 2, Exhibit 21 and 50-1 at 51.

The pertinent issues before the Court are: (1) when Plaintiffs should have discovered the alleged breach; and, (2) whether the time between its discovery and notice to Defendant was reasonable.[9]

It is undisputed that in early 2005 Plaintiffs learned of the Distributor Incentives on Non-Units that Defendant offered to distributors other than Plaintiffs. ECF No. 46-1 at 19. Defendant alleges that the time between discovering the alleged breach and the filing of Plaintiffs' July 21, 2009 Complaint is unreasonable because Plaintiffs learned of Defendant's Distributor Incentives offered to distributors, not including Plaintiffs, in 2005. ECF No. 46-1 at 18-19. Plaintiffs acknowledge that Kevin Hancock had knowledge of Franklin's distributor incentive programs; Plaintiffs, however, allege that Hancock's "knowledge cannot be imputed to [Plaintiffs] for the purpose of establishing knowledge of Franklin's breach to trigger the notice requirements." ECF No. 53 at 37. Plaintiffs argue that they did not have "actual knowledge" of Franklin's alleged

---

[9] Plaintiffs argue that Ind. Code § 26-1-2-607(3)(a) "is meant to apply to assertions for breach of warranties, not breaches of pricing provisions as is the case here." ECF No. 53 at 36. Plaintiffs assertion is misplaced. In *LDT Keller Farms, LLC v. Brigitte Holmes Livestock*, the Court explained:

> The buyer must give notice in all cases in which it has accepted a tender of non-conforming goods, and such non-conformity 'includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract.' Ind. Code § 26-1-2-714 cmt 2. 'The language of [UCC § 2-607(3)(a)] refers to 'any breach' without differentiating warranty and contract claims.'

Case No. 1:08-CV-243, 2011 U.S. Dist. LEXIS 34209, at *27 (N.D. Ind. Mar. 30, 2011).

(1:09CV01790)

breach of Paragraph 4(N) until Plaintiffs' President, William Waltz, "received a copy of a distributor incentive program in March, 2009." ECF No. 53 at 37. Plaintiffs' argument fails for the reasons set forth below.

The record reflects that Plaintiffs should have known or discovered Franklin's alleged breach of Paragraph 4(N) in the Settlement and Mutual Release Agreement several years before the filing of their 2009 Complaint. On February 5, 2005, Plaintiffs' National Sales Manager, Dave Harris, sent a fax to Plaintiffs' Vice President, Sales and Distributor, Kevin Hancock, regarding Defendant's lower pricing programs to distributors. ECF No. 47 at 48-55, Exhibit 5. The fax reflects that Franklin provided distributors rebates and other discounts. ECF No. 47 at 49-55, Exhibit 5. On August 29, 2006, Plaintiffs' President, William Waltz, received an email stating that "Franklin also provides a rebate to distributors of 10"-12% on the 6"-8" motors."[10] ECF No. 47 at 62-63, Exhibit 7. Plaintiffs' contention that it was not until 2009 that Franklin had notice is strained beyond the point of breaking. The record reflects that the 2005 fax and 2006 email provided Kevin Hancock and William Waltz, respectively, with information that amounted to that which should have led to the discovery of Franklin's alleged breach of contract.

---

[10] On August 29, 2006, Mary Jo Surges forwarded an email to Carlo Prola and courtesy copied "Bill Waltz." ECF No. 47 at 62. The email states in part:

> You are correct that Franklin provides distributors with a .388 multiplier. Our market intelligence shows that Franklin also provides a rebate to distributors of 10%-12% on the 6"-8" motors. Please note that our partnership with Franklin, in the past, was not based on purchasing product at [the] distributor price. The distributor price and rebate from Franklin define the market pricing that will be needed to position our products competitively in the market.

ECF No. 47 at 62.

-10-

(1:09CV01790)

Plaintiffs' reliance upon principal and agent law to excuse their failure to give timely notice or failure to timely file is misplaced.[11]  Based upon the record before the Court, Plaintiffs, at the very least, *should* have discovered the alleged breach of Paragraph 4(N) in the Settlement and Mutual Release Agreement prior to 2009 and been able to provide Franklin with notice.

Upon Plaintiffs' discovery of Franklin's alleged breach of contract, Plaintiffs were required to provide Franklin with notice.  Notice is a condition precedent to recovery and as such, the buyer's failure to provide timely notice waives its right to assert breach of contract.  *Lemon v. Anonymous Physician*, No. 1:04-CV-2083, 2005 WL 2218359, at *2 (S.D. Ind. Sept. 12, 2005) (dismissing claims under Rule 12(b)(6) because no notice was given).  "[S]ufficient notice requires 'notice of the factual circumstances sufficient for the seller to determine that the buyer has ground for a claim of breach.'"  *Artistic Carton Co. v. Thelamco, Inc.*, Case No. 1:06-CV-316, 2009 U.S. Dist. LEXIS 86994, at *10 (N.D. Ind. Sept. 22, 2009); *see also In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 155 F.Supp.2d 1069, 1110-1111 (S.D. Ind. 2001) ("[T]he more well-reasoned cases are those that hold that the filing of a complaint may be sufficient to satisfy the notice of breach requirement of § 2-607 under certain circumstances.").  "Whether the time was reasonable under the circumstances is ordinarily a question for the jury, unless no inference could be drawn from the evidence but that the notice was unreasonable." *Hays v. GE*, 151 F.Supp.2d 1001, 1012 (7th Cir. 2001); *see Artistic Carton Co.*, 2009 U.S. Dist. LEXIS 86994, at *10-11 ("Only when the time for notice is exceptionally

---

[11] "It is only in the absence of such specific statutory treatment that the Code should be supplemented by general principles of agency law. U.C.C. § 1-103."  *Ceres Inc. v. Acli Metal & Ore Co.*, 451 F.Supp. 921, 923 (7th Cir. 1978).

(1:09CV01790)

long may the question become one of law."). The lapse of time between when Plaintiffs should

have discovered the alleged breach in 2005 and the filing of the Complaint is four-and-a-half

years. ECF No. 1. The Court finds that four-and-a-half years is "exceptionally long," and,

therefore, a legitimate inference may be drawn that notice to Franklin was unreasonable.

**b.**

The interpretation and construction of a contract is a function of the courts. *Kiltz v. Kiltz*,

708 N.E.2d 600, 602 (Ind. Ct. App. 1999). Indiana courts give clear and unambiguous contract

provisions its "plain, usual, and ordinary meaning."[12] *Roy A. Miller & Sons, Inc. v. Indus.*

*Hardwoods*, 775 N.E.2d 1168, 1172 (Ind. Ct. App. 2002) (quoting *Samar, Inc. v. Hofferth*, 726

N.E.2d 1286, 1290 (Ind. Ct. App.2000)). "If the language of the agreement is unambiguous and

the intent of the parties is discernible from the written contract, the court must give effect to the

terms of the contract." *Stenger v. LLC Corp.*, 819 N.E.2d 480, 484 (Ind. Ct. App. 2004).

"An ambiguity exists only where reasonable people could come to different conclusions

about the contract's meaning." *Roy A. Miller & Sons, Inc.*, 775 N.E.2d at 1172 (quoting *Ecorp,*

*Inc. v. Rooksby*, 746 N.E.2d 128, 131 (Ind.Ct.App.2001)). That is, "[i]f a contract is ambiguous

solely because of the language used in the contract and not because of extrinsic facts, then its

construction is purely a question of law for the courts. *Ecorp, Inc.*, 746 N.E.2d at 131 (citing

*Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind.1995)). The Indiana Supreme Court

explained: "[W]e must leave to the individual parties the right to make the terms of their

---

[12] The Agreement contains an Indiana choice of law provision that governs the instant
contract claim. *See* ECF No. 47 at 8, 18.

-12-

(1:09CV01790)

agreements as they deem fit and proper, and, as long as those terms are clear and unambiguous and are not unlawful, we can only enforce them as agreed upon." *New Welton Homes v. Eckman,* 830 N.E.2d 32, 35 (Ind. 2005). Nonetheless, a contract term is not ambiguous merely because the parties disagree about the term's meaning. *Roy A. Miller & Sons, Inc.,* 775 N.E.2d at 1172.

Here, the facts, viewed most favorable to the non-moving party, support a finding that Paragraph 4(N) demonstrates no genuine issue of material fact to preclude summary judgment on Plaintiffs' breach of contract claim. The express language in Paragraph 4(N) is clear and unambiguous, and the Court need not go beyond the "plain, usual, and ordinary meaning." *Roy A. Miller & Sons, Inc.,* 775 N.E.2d at 1172.

The plain and ordinary meaning of Paragraph 4(N), as written, pertains solely to price "raises" and "increases" on Non-Units sold to Plaintiffs. ECF No. 47 at 24. Paragraph 4(N) does not constrain Defendant to insure Plaintiffs receive the best or lowest Non-Unit pricing. The plain and ordinary meaning of "increase" and "raise" does not equate to "decrease." The unambiguous terms of Paragraph 4(N) does not require the Court to construe the contract or look to extrinsic evidence, but rather simply requires the Court to apply the contractual provisions as conclusive.

Plaintiffs have failed to make a showing sufficient to establish the existence of a genuine issue of material fact regarding the interpretation and enforcement of Paragraph 4(N) of the Settlement Agreement because the contractual provisions of Paragraph 4(N), according to the plain and ordinary meaning of the language as written, do not expressly state or refer to prices prior to the Settlement Agreement; nor does the plain and ordinary written language promise

-13-

(1:09CV01790)

Plaintiffs prices that are 18.8% lower than Defendant's Non-Unit prices for other customers. ECF No. 47 at 24.

Furthermore, Paragraph 4(K) unambiguously states, "Except as otherwise stated expressly in this Agreement, and except as provided in Section M below, all other previously announced allowances, discounts and programs for Franklin products shall be eliminated, effective October 17, 2004." ECF No. 47 at 23. The Settlement Agreement became effective on October 30, 2004, which unambiguously illustrates that Plaintiffs' pricing advantage argument is inapplicable. ECF No. 47 at 28.

### B. Count II

Plaintiffs contend in Count II that Franklin tortiously interfered with Plaintiffs' contractual relationship with Preferred Pump and Equipment, LP. ECF Nos.1 at 23-24 and 49-1 at 16. Specifically, Plaintiffs argue that "Franklin tortiously interfered with [Plaintiffs'] Distributor Agreements with Preferred through the improper exercise of market power in an anti-competitive manner" and "coerce[d] Preferred to breach its contract with [Plaintiffs]." ECF No. 53 at 41-42, 48.

### 1. Relevant Undisputed Facts (Related to Count II of the Complaint)

Plaintiffs do not dispute that the two-year statute of limitations contained in Wis. Stat. § 893.57 applies to their claim for tortious interference with contract; nor do Plaintiffs contest that they discovered their alleged tort action earlier than two years before the Complaint was filed on July 31, 2009. ECF Nos. 53 at 43, 45 and 46-1 at 30-31. Plaintiffs contend, however, that their tortious interference claim is not time-barred by virtue of the "continuing tort" doctrine.

-14-

(1:09CV01790)

ECF No. 53 at 44-45. Franklin argues that Plaintiffs' tortious interference claim accrued, if at all, prior to July 31, 2007, and the discovery rule bars the claim. ECF No. 46-1 at 31-32.

### 2. Continuing Tort Doctrine

The continuing violation doctrine acts as a defense to the statute of limitations by delaying the accrual or start date. *Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir.2008); *see also Hukic v. Aurora Loan Serv.*, 588 F.3d 420, 435 (7th Cir.2009). The doctrine applies when "a tort involves a continued repeated injury" and "the limitation period does not begin until the date of the last injury or when the tortious act ceased." *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005). To establish a continuing violation, the defendant's acts must be "related closely enough to constitute a continuing violation" and not "merely discrete, isolated, and completed acts which must be regarded as individual violations." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir.1994). Consistent with this reasoning, the continuing tort doctrine is misnamed because it is "not about a continuing, but about a cumulative, violation." *Limestone Dev. Corp.*, 520 F.3d at 801 (stating that the doctrine allows a "suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought").

In *Belleville Toyota*, the plaintiff alleged that the defendants breached a number of dealership agreements between the parties. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill.2d 325, 329 (2002). Under the agreements, the defendants were required to use their "best efforts" to provide the plaintiff with vehicles. *Id*. The plaintiff sued the defendants alleging that the defendants failed to allocate Toyota vehicles in the quantities "contractually

-15-

(1:09CV01790)

required." *Id.* at 330. On appeal, the defendants argued that the plaintiff's claim was time-barred, and that the trial court erroneously applied the continuing tort doctrine to toll running the statute of limitations. *Id.* at 345. The Court held that the continuing tort doctrine did not apply and explained in part:

> Although we recognize that the allocations were repeated, we cannot conclude that defendants' conduct somehow constituted one, continuing, unbroken, decade-long violation of the Act. Rather, each allocation constituted a separate violation of section 4 of the Act, each violation supporting a separate cause of action. Based on the foregoing, we agree with defendants that the appellate court erred in affirming the trial court's application of the so-called continuing violation rule.

*Id.* at 348-49.

In the instant matter, the claim of tortious interference hinges upon Franklin's alleged interference with the "best efforts" obligation in the agreement between Plaintiffs and Preferred Pump and Equipment agreements. ECF No. 53 at 46. Plaintiffs allege that Franklin engaged in continued anti-competitive conduct, through the use of its market dominance in submersible motors, to induce Preferred Pump and Equipment to breach its contract with Plaintiffs. ECF No. 53 at 45. Plaintiffs, as the non-moving party, have an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992). Plaintiffs have failed to establish a genuine issue of material fact indicating that Franklin's alleged interference with its business relationship with Preferred Pump and Equipment constitutes a continuing violation rather than discrete, isolated acts. *See Belleville Toyota, Inc.*, 199 Ill.2d at 348-49.

-16-

(1:09CV01790)

### 3. Discovery Rule

Claims of the sort alleged by Plaintiffs in Count II "shall accrue upon the date the injury is discovered or, with reasonable diligence, should have been discovered, whichever occurs first." *Hansen v. A.H. Robins, Inc.*, 112 Wis.2d 550, 560 (1983) (overruling all cases holding tort claims to accrue at time of negligent act or injury); *see also Ward Management Co. v. Westport Ins. Corp.*, 598 F.Supp.2d 923, 927 (W.D. Wis. 2009) ("Under § 893.57, defendant's alleged bad faith claim accrued no later than February 14, 2006. Because plaintiff did not file its original claim until February 25, 2008, more than two years after its claim accrued, plaintiff's bad faith is time-barred.").

"Accrual requires that plaintiffs discover, or with reasonable diligence should have discovered, 'not only the fact of injury but also that the injury was probably caused by the defendant's conduct . . . .'" *Gumz v. Northern States Power Co.*, 305 Wis.2d 263, 267-77 (2007) (quoting *Borello v. U.S. Oil Co.*, 130 Wis.2d 397, 411 (1986)). The *Gumz* Court explained that in 1991 Plaintiffs noticed behavioral and physical problems with their dairy farm cows. *Gumz*, 305 Wis.2d at 270. Four years later, the Gumz's had Defendant and an independent electrician check their farm for stray voltage, however, the results showed that the voltage was below the "level of concern." *Id.* at 272. In 1998 and 1999, an independent electrician "provided the [Plaintiff's] equipment that monitored voltage on the barn floor," and the results illustrated a direct correlation between the herd's poor health and high voltage. *Id.* at 272-73. In 2001, Plaintiffs filed suit against Defendant "for damages resulting from stray voltage for Northern States' system." *Id.* at 275. The Supreme Court of Wisconsin determined: "[A]s a matter of

-17-

(1:09CV01790)

law[,] [] the Gumz's exercised reasonable diligence. Prior to May 1996 the Gumz's did not know, nor with reasonable diligence should they have known, that stray voltage from Northern States was a cause of damages to their herd." *Id.* at 284-85.

In the instant matter, Plaintiffs' cause of action was filed on July 31, 2009; and thus, in order for the statute of limitations to bar the instant claim, Franklin must show that the injury was or should have been discovered before July 31, 2007. The Court finds that Plaintiffs discovered or should have discovered the alleged injury before July 31, 2007, and that the alleged injury was "probably caused by [D]efendant's conduct." *Gumz*, 305 Wis.2d at 267-77. Unlike *Gumz*, Plaintiffs had objective knowledge that Franklin supposedly tortiously interfered with Plaintiffs distribution agreements. The record reflects the following:

- **Plaintiffs' email dated September 8, 2005**: Pentair Corporate Commodity Manager, Kerry Jacques stated, "As you are aware, Franklin is aggressively pursuing market share traditionally held by Pentair. Franklin has dropped product prices and has interfaced with key Pentair customers." ECF Nos. 46-1 at 32 and 48 at 5-6, Exhibit 21. President William Waltz was blind courtesy copied, per his request. ECF No. 48 at 2, Exhibit 21.

- **Plaintiffs' "Root Cause & Countermeasure Form" dated September 14, 2006**: Vice President, Sales and Distributor, Kevin Hancock, discussed at his deposition, "[T]he fear [that] Franklin put in distribution was potentially they could be cut off from a full motor offering." ECF Nos. 49 at 73 and 48 at 8, Exhibit 22.

- **Plaintiffs President William Waltz's email to Preferred Pump and Equipment, LP owner, Randy Lyne dated March 2, 2007**: "In a conversation with the two of us, I asked has any OEM ever let you define the program and you said you were able to do with Franklin." ECF Nos. 46-1 at 32 and 48 at 32, Exhibit 24.

- **Plaintiffs' "Distributor Fly In Notes, Possible Questions, etc." dated June 16, 2007**: Vice President, Sales and Distributor, Kevin Hancock, stated at his deposition, "I believed that Preferred was a significant customer of Franklin and getting very low pricing." ECF Nos. 46-1 at 32; 47-1 at 71, Exhibit 19; 49-1 at 34-35.

-18-

(1:09CV01790)

- **Plaintiffs' "Water Systems Monthly Highlights" dated June 18, 2007**: "Franklin continues to drive pricing in the market to new lows." ECF Nos. 46-1 at 32 and 48 at 27, Exhibit 25.

- **Plaintiffs' email dated June 26, 2007**: Senior Sale Representative, Jeff Riley, informed Kevin Hancock that, "Per your request I have put together a few notes and observations of my recent dealing with Preferred Pump. Preferred Pump as of today has done little to support the sale of Pentek powered submersible pumps in the State of Minnesota. Further more they have taken every opportunity to switch pump installer to Franklin branded pumps." ECF Nos. 46-1 at 32 and 47-1 at 68, Exhibit 18.

- **Plaintiffs President William Waltz's forwarded email dated July 31, 2007**: "[T]hey [Franklin] are selling well under our [Sta-Rite's] price (and historical pricing) on their net 2007 pricing (they told Preferred and 2M to create their own program, just grow). I also have other data points where Franklin's price to Preferred is around our costs. They are buying share." ECF Nos. 46-1 at 32 and 48 at 20-22, Exhibit 23.

As the record shows that Plaintiffs knew or should have known, had reasonable diligence been employed, that Franklin tortiously interfered with Plaintiffs' distribution agreements, the applicable statute of limitations bars Count II of Plaintiffs' complaint.

Defendant's Motion for Summary Judgment on both counts of the Complaint is granted.

### C. Franklin's Counterclaim Presents No Genuine Issue of Material Fact

Franklin asserted a single Counterclaim against Plaintiffs for breach of Paragraph 4(P) of the Settlement and Mutual Release Agreement. ECF No. 4. Section 4(P) of the Settlement Agreement provides:

> Except in the case of product shortage, Franklin shall supply all Units ordered by Pentair, provided that Franklin reserves the right to curtail its supply of Units to the extent Pentair's orders are unreasonably in excess of Pentair's historical levels, as measured by its average daily purchases during the preceding three months. In the case of Unit shortage, Franklin shall reasonably allocate available Units to all of its customers, including its affiliates, consistent with its customers' prior twelve months' purchases in the USA and Canada. **Except as otherwise provided in this Agreement, with respect to all products other than Units, the parties shall deal with one another in good faith in the sale and purchase of**

-19-

(1:09CV01790)

**such products**.

ECF No. 45-4 at 11 (emphasis added). Specifically, Franklin alleges that Plaintiffs breached the

duty of good faith contained in Paragraph 4(P) Settlement Agreement by virtue of three

activities: (1) failure to provide warranty service; (2) defacement of Franklin's logo on its

product; and (3) disparagement of Franklin's product. ECF No. 4 at 9-12. Franklin's

Counterclaim specifies in part:

> Plaintiffs [] breached their obligations to provide warranty service on Franklin's
> products in return for warranty allowances. [] Despite receipt and full acceptance
> of Franklin's warranty allowance, Plaintiffs refused to honor Franklin's warranty
> and required customers to accept Plaintiffs' product as a credit or replacement
> instead.

> [B]eginning in or about late 2005, Plaintiffs, its employees and agents, removed or
> defaced the Franklin logo and trademark appearing on pump motor units sold by
> Plaintiffs in a number of distribution outlets across the country, including retail
> stores in the State of Ohio.

> Plaintiffs also engaged in a campaign to disparage Franklin's products by falsely
> representing to customers and the trade at large that Franklin's motors were
> inferior to Plaintiffs' product line and also misrepresenting in advertisements and
> technical literature the capabilities of Plaintiffs' alternative motors as compared
> with Franklin's motors.

ECF No. 4 at 9-11.

Plaintiffs do not dispute the alleged conduct, but rather allege that the Settlement

Agreement does not govern the warranty allowance, defacement, or disparagement. ECF No. 45

at 15, 17-20.

## 1. The Plain, Usual, and Ordinary Meaning of Paragraph 4(P)

As earlier described, Indiana courts give clear and unambiguous contract provisions its

"plain, usual, and ordinary meaning." _Roy A. Miller & Sons, Inc._, 775 N.E.2d at 1172. "If the

(1:09CV01790)

language of the agreement is unambiguous and the intent of the parties is discernible from the written contract, the court must give effect to the terms of the contract." *Stenger*, 819 N.E.2d at 484. The Indiana Supreme Court instructs courts "to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties." *First Federal Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (1990).

There is no genuine issue of material fact as to whether the Plaintiffs' conduct was in violation of "good faith in the sale and purchase" of Franklin's products such that Plaintiffs breached Paragraph 4(P). The express language in Paragraph 4(P) is clear and unambiguous. It limits its affect to acts constituting a "sale" or a "purchase" of Non-Units. *Roy A. Miller & Sons, Inc.*, 775 N.E.2d at 1172 ( finding the Court need not go beyond the "plain, usual, and ordinary meaning"). The plain and ordinary meaning of Paragraph 4(P) is that Franklin must sell Plaintiffs its Non-Units in good faith and Plaintiffs must purchase Franklin's Non-Units in good faith. ECF No. 45 at 23 ("[A] reading of the entire provision demonstrates that the good faith obligation is clearly meant to apply only to Franklin Electric's output of Non-Units and Pentair's requirements for the same.").

The operative language at issue limits the good faith obligation solely to the interactions between Franklin and Plaintiffs. It does not extend to their interactions with third parties. ECF No. 45-4 at 11. Franklin's Counterclaim is premised upon Plaintiffs' conduct with third parties: Franklin customers who "complained about the lack of proper warranty service. . . ;" Lowe's Home Improvement and other retail outlets; and "distributors and other customers" who were exposed to Plaintiffs' alleged misrepresentations. ECF No. 60 at 11, 20, 22. Stated differently,

(1:09CV01790)

the good faith obligation does not apply to Franklin's allegations in its counterclaim, as and the

Court must defer to the plain and ordinary meaning of the language and the obvious intentions of

the parties as evident from within the four corners of the Settlement Agreement.

### 2. The Realm of "Good Faith"

"[T]he doctrine of good faith merely directs a court towards interpreting contracts within

the commercial context in which they are created, performed, and enforced . . . ."[13] *Fifth Third*

*Bank of Ind. v. The Morely Group, LLC*, Case No. 1:05-CV-0055, 2005 WL 4882768, at *2 (S.D.

Ind. July 28, 2005) (citing Ind. Code § 26-1-1-203). The Indiana Supreme Court explained:

> [C]ourts are bound to recognize and enforce contracts where the terms and the
> intentions of the parties can be readily determined from the language in the
> instrument. It is not the province of courts to require a party acting pursuant to
> such a contract to be 'reasonable,' 'fair,' or show 'good faith' cooperation. Such
> an assessment would go beyond the bounds of judicial duty and responsibility.

*First Federal Sav. Bank of Ind.*, 559 N.E.2d at 604.

To avoid placing the Court at the negotiation table with the parties, the proper posture for

the Court is to "find and enforce the contract as written and leave the parties where it finds

them." *Id.* Franklin generally describes the background supporting its Counterclaim under the

heading "Plaintiffs' Unfair Acts," and describes Plaintiffs' conduct as "unfair and deceptive

practices." ECF No. 4 at 9,11. Franklin's allegations require the Court to rely upon more than

---

[13] The ordinary meaning of "good faith" is "honesty in fact in the conduct or
transaction." Ind. Code § 26-1-1-201(19). The UCC refers to "reasonable commercial
standards" in defining what is "good faith" for a merchant. *Rheem Mfg. Co. v. Phelps Heating &
Air Conditioning, Inc.*, 746 N.E.2d 941, 952 n.10 (2001) (citing Ind. Code § 26-1-2-103(b)). The
UCC in turn "imposes an obligation of good faith in [a contract's] performance or enforcement."
*Rheem Mfg. Co.*, 746 N.E.2d at 952 n.10 (citing Ind. Code § 26-1-1-203).

(1:09CV01790)

the Settlement Agreement's explicitly written terms.  The Court declines the invitation to assess

whether Plaintiffs' conduct has been "reasonable, fair, or show good faith" cooperation.

Defendant's Counterclaim presents no genuine issue of material fact.  Plaintiffs' Motion

for Summary Judgment on Defendant's Counterclaim is granted.

### III.  Conclusion

For the reasons provided above, the Court grants Plaintiffs' Motion for Summary

Judgment on Defendant's Counterclaim (ECF No. 45) and Defendant's Motion for Summary

Judgment on both Counts of the Complaint (ECF No. 46) in their entirety, thereby, dismissing all

claims in the case with prejudice.

IT IS SO ORDERED.

_September 30, 2011_
Date

Benita Y. Pearson
United States District Judge
-23-